FILED
United States Court of Appeals
Tenth Circuit

December 28, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

---

JEFFERSON COUNTY SCHOOL DISTRICT R-1,

      Plaintiff - Appellant,

v.

ELIZABETH E., by and through her parents, Roxanne B. and David E.,

      Defendant - Appellee.

_____

COLORADO ASSOCIATION OF SCHOOL BOARDS; KANSAS ASSOCIATION OF SCHOOL BOARDS; NATIONAL SCHOOL BOARDS ASSOCIATION; NEW MEXICO SCHOOL BOARDS ASSOCIATION; OKLAHOMA STATE SCHOOL BOARDS ASSOCIATION; UTAH SCHOOL BOARDS ASSOCIATION; UNITED STATES OF AMERICA; NATIONAL ALLIANCE ON MENTAL ILLNESS; NATIONAL ALLIANCE ON MENTAL ILLNESS COLORADO,

      Amici Curiae.

No. 11-1334

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:10-CV-00741-WJM-KMT)**

---

W. Stuart Stuller (Alyssa C. Burghardt with him on the briefs), Caplan and Earnest LLC, Boulder, Colorado, for Plaintiff-Appellant.

Katherine Gerland (Eloise Henderson Bouzari with her on the briefs), Law Offices of Louise Bouzari, LLC, Englewood, Colorado, for Defendant-Appellee.

Erin Aslan, Attorney, U.S. Department of Justice, Civil Rights Division, Washington, D.C. (Philip H. Rosenfelt, Acting General Counsel, U.S. Department of Education; Thomas E. Perez, Assistant Attorney General, Mark L. Gross, Attorney, U.S. Department of Justice, Civil Rights Division, Washington, D.C., with her on the brief), for the United States as Amicus Curiae supporting Appellee.

Jack D. Robinson, Spies, Powers & Robinson, P.C., Denver, Colorado, on the brief for Counsel for National Alliance on Mental Illness and National Alliance on Mental Illness Colorado, as Amici Curiae supporting Appellee.

Francisco M. Negrón, Jr., General Counsel, National School Boards Association, Alexandria, Virginia; Joe R. Tanguma, Walsh, Anderson, Brown, Gallegos and Green, P.C., Houston, Texas, on the brief for National School Boards Association, Colorado Association of School Boards, Kansas Association of School Boards, New Mexico School Boards Association, Oklahoma State School Boards Association, and Utah School Boards Association as Amici Curiae in support of Appellant.

---

Before **MURPHY**, **GORSUCH**, and **MATHESON**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I.    Introduction

Defendant-Appellee Elizabeth E., at all times relevant to this appeal, was a student in the Jefferson County, Colorado school system with substantial behavioral and emotional issues for which she required special education under the Individuals with Disabilities in Education Act ("IDEA" or the "Act"), 20 U.S.C. § 1400. In November 2008, Elizabeth's parents, Roxanne B. and David E.

("Parents"), enrolled her at Innercept, LLC ("Innercept"), a residential treatment center in Idaho, and sought reimbursement from Plaintiff-Appellant Jefferson County School District R-1 (the "District"). *See* 20 U.S.C. § 1412(a)(10)(C)(ii). An Impartial Hearing Officer (IHO) concluded Parents were entitled to reimbursement for the placement under the Act. That decision was affirmed by a state Administrative Law Judge (ALJ), whose decision was, in turn, affirmed by the United States District Court for the District of Colorado. The District appeals, arguing Innercept is not a reimbursable placement under the IDEA and that Parents' conduct precluded reimbursement. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the judgment of the district court.

## II.    Background

### A.  Statutory Framework

The IDEA provides federal funding to states to assist with the education of disabled children on the condition that states comply with the Act's "extensive goals and procedures." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982).[1] One of the Act's stated purposes is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C.

---

[1]The IDEA was originally titled the Education of the Handicapped Act; its name was changed in 1990. *See Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1268 n.1 (10th Cir. 2007).

§ 1400(d)(1)(A). States that receive federal funding under the IDEA must provide all eligible students with a free appropriate public education ("FAPE"). *Id.* § 1412(a)(1)(A); *Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008). "To provide an eligible student with a FAPE, states must develop an [Individualized Education Plan] for each qualifying student." *Sytsema*, 538 F.3d at 1312. An Individualized Education Plan ("IEP") is a detailed written document which describes the student's educational goals for an academic year and establishes a plan to achieve those goals. *See id.*; 20 U.S.C. § 1414(d)(1)(A)(I). The Act sets forth detailed procedures through which an IEP is to be developed with the participation of the child's parents, teachers, special education teachers, school officials, and other parties with knowledge of the child's special needs. *See generally* 20 U.S.C. § 1414(d). Further, the Act requires states to develop and maintain procedural safeguards to ensure disabled children receive a FAPE. *See id.* § 1415. Such procedures include an impartial due process hearing to address parental complaints over a school district's actions with respect to a child's IEP. *Id.* § 1415(f).

## B. Factual Background

Though the parties disagree on the import of certain facts, their versions of events which gave rise to these proceedings are substantially identical and any differences are not material to our analysis. Elizabeth was born in 1991. Parents became her foster parents when she was sixteen months old after she was

neglected by her birth parents. Parents adopted Elizabeth when she was three-and-a-half years old. In March 2000, Elizabeth and Parents moved to Colorado where she attended public school and was identified as a student eligible for special education under the IDEA.

Pursuant to two consecutive mediated settlements between Parents and the District concerning whether the District was meeting its IDEA obligations, Elizabeth attended ninth and tenth grade at Humanex Academy, a private school in Colorado which specializes in the education of children with significant learning disabilities and emotional and behavioral issues. At Humanex, Elizabeth would typically start out well early in the year but struggle academically and socially by the end of the year. By the end of the 2007-08 school year, Elizabeth had not earned enough credits to advance to the eleventh grade. Parents and the District began discussions related to Elizabeth's placement options. On August 11, 2008, Parents and the District entered into a settlement agreement pursuant to which the District would pay tuition at Humanex during the 2008-09 academic year. The agreement also called for an IEP team meeting to be convened by August 29, 2008, to arrange for an evaluation of Elizabeth. Meanwhile, Elizabeth's behavior at home began to deteriorate, and Parents commenced consideration of temporary psychiatric hospitalization options for her. Parents advised the District they were considering such hospitalization on August 15, 2008. On August 20, 2008, Elizabeth was admitted to the Aspen Institute for

-5-

Behavioral Assessment in Utah; on August 26, Parents notified the District of the placement by email.

On September 24, 2008, the director of Humanex notified Parents that the District had withdrawn Elizabeth from the school because it was unwilling to incur the cost of her tuition when she was not in attendance. The District took this position notwithstanding an agreement it had with Humanex whereby it would be refunded at the end of the semester for any months Elizabeth did not attend. Parents, through counsel, notified the District they considered the nonpayment of Elizabeth's tuition at Humanex a breach of the parties' settlement agreement. The District, also through counsel, responded: "[I]t appears that at this point, the settlement agreement is moot, as parents have unilaterally placed Elizabeth at the Aspen Center in Utah. As such, Elizabeth is not a District student, and the District has no on-going responsibility to Elizabeth under the IDEA."

In a letter dated November 10, 2008, Parents notified the District they intended to enroll Elizabeth at Innercept in Idaho in ten business days and that they would seek reimbursement for the cost of the placement. *See* 34 C.F.R. § 300.104. On November 20, 2008, the District responded:

> As you are aware, pursuant to a settlement agreement, the District was in the process of evaluating Elizabeth to develop an individualized education program and appropriate placement for Elizabeth when her parents unilaterally placed her in a program in Utah. It now appears that her parents are transferring Elizabeth to a

program in Idaho.  The School District will not be providing reimbursement to the family, but stands ready, willing, and able to provide Elizabeth with a free appropriate public education if she returns to the School District.

On December 3, 2008, Elizabeth's mother stated in an email to the District:

[We] think that a more productive and cost-efficient way to move forward, rather than drawing lines in the sand, is to start anew and all work together to complete Elizabeth's IEP.  How would you like to proceed with this process?  What do you think the next steps should be?  Who do you see participating on the IEP team?

The District responded on December 9, 2008:

[Because] you unilaterally placed her in Idaho, the District does not presently have an obligation to evaluate, convene IEP team meetings for, or otherwise serve Elizabeth under the IDEA.  However . . . the District stands ready, willing, and able to evaluate and provide Elizabeth with a free appropriate public education upon her return to the District.

In response to another email from Elizabeth's mother stating Elizabeth "is still under contract with Jefferson County for the 2008–09 school year," the District reiterated it would re-engage in the effort to provide an IEP for Elizabeth only if she returned to Jefferson County.

Parents requested an administrative due process hearing and reimbursement for Elizabeth's placement at Innercept.  *See* 20 U.S.C. § 1415(f).  After conducting a five-day hearing in August 2009, the IHO issued a decision concluding the District failed to make a FAPE available to Elizabeth in a timely manner prior to her enrollment at Innercept, that Innercept was a reimbursable placement under the IDEA, and Parents were entitled to reimbursement from the

District for that enrollment. The IHO declined to deny or reduce reimbursement based on the District's allegations that Parents failed to provide sufficient notice prior to Elizabeth's placement, failed to make Elizabeth available for an evaluation, or otherwise acted unreasonably. An ALJ affirmed substantially all of the IHO's conclusions, reversing only the IHO's award of travel costs to and from Innercept for family therapy. The District then brought an action in the United States District Court for the District of Colorado, seeking review of the ALJ's decision pursuant to 20 U.S.C. § 1415(i)(3)(A). The district court affirmed the decision of the ALJ.

At no point before the ALJ, district court, or this court has the District challenged the IHO's conclusion it failed to provide a FAPE to Elizabeth. Instead, the District advances two defenses to reimbursement under the IDEA. First, the District argues Elizabeth's placement at Innercept is not reimbursable under the IDEA because it does not provide her with "special education" and "related services" as defined in the Act. Second, the District argues reimbursement should have been reduced or denied pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii).

## III. Discussion

### A. Appropriateness of Innercept Under the IDEA

#### 1. Standard of Review

This court reviews the judgment of the district court *de novo*, applying the same standard as the district court. *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). "Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified de novo standard when reviewing agency disposition in the IDEA context." *Garcia v. Bd. of Educ.*, 520 F.3d 1116, 1125 (10th Cir. 2008). Specifically, 20 U.S.C. § 1415(i)(2)(C) states that a district court adjudicating an IDEA appeal "shall receive the records of the administrative proceedings . . . hear additional evidence at the request of a party; and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Additionally, "though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that due weight must be given to the administrative proceedings, the fact findings of which are considered *prima facie* correct." *Garcia*, 520 F.3d at 1125 (citation and quotations omitted).

#### 2. Residential Placements Under the IDEA

20 U.S.C. § 1412(a)(10)(C)(ii) provides:

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

*See also Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  Parents who make unilateral placements at a private school, however, "do so at their own financial risk.  They are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act."  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (citation and quotation omitted).  Although it did not provide a FAPE to Elizabeth, the District contends Parents are still not entitled to reimbursement because the placement at Innercept was not "proper" under the IDEA.  More precisely, the District contends the cost of Elizabeth's placement at Innercept is not reimbursable because the services provided do not constitute "special education" and "related services" under the Act.

Courts have taken different approaches in determining whether a private residential placement is reimbursable under the IDEA.  In *Kruelle v. New Castle County School District*, 642 F.2d 687, 693–94 (3d Cir. 1981), the Third Circuit held that when determining whether a residential placement is reimbursable as special education under the Act the "[a]nalysis must focus . . . on whether

full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." *Kruelle* involved a claim for reimbursement by the parents of Paul Kruelle, a child with an I.Q. well below thirty who suffered from severe physical and emotional problems. *Id.* at 688–89. After concluding the school district's proffered educational plan did not provide a FAPE within the meaning of the Act, the district court ordered the school district to provide reimbursement for a full-time residential program. *Id.* at 690. Affirming this judgment, the court rejected the argument that the residential placement was not reimbursable because it was required for non-educational reasons, such as medical and domiciliary care, noting "the concept of education is necessarily broad with respect to persons such as Paul," *id.* at 693, who could not walk, dress himself, or eat unaided, *id.* at 688. The discussion in *Kruelle* addressed only whether the residential placement at issue provided "special education," within the meaning of the Act. *Id.* at 694 n.23.

Recently, in *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 248–49 (3d Cir. 2009), the Third Circuit clarified its holding in *Kruelle*, concluding the parents of a child with severe emotional disabilities were not entitled to reimbursement for the child's placement in a long-term psychiatric residential treatment center. The treatment center had no educational accreditation, on-site school, special education teachers, or school affiliation. *Id.*

-11-

at 239.  Citing *Kruelle*, the Third Circuit noted, "not all services that can be broadly construed as educational are cognizable under IDEA . . . because ultimately any life support system or medical aid can be construed as related to a child's ability to learn."  575 F.3d at 244 (quotation omitted).  Further, the court rejected the argument that a residential placement provides special education so long as it utilizes similar modalities employed by schools.  *Id.* at 245.  Instead, "the relevant consideration is not the tool the institution uses, but rather the substantive goal sought to be achieved through the use of that tool."  *Id.*  Because the services offered by the residential treatment center in *Mary T.* were designed to help the child manage her medical condition, rather than to address her educational needs, the court concluded they were not reimbursable as special education under the IDEA.  *Id.*  Stated differently, the court concluded the child's learning needs and medical needs were "severable."  *Id.* at 246.  The court also concluded the child's treatment was not a "related service," under the Act but was instead an excluded "medical service" for which the Act does not provide reimbursement.  *Id.* at 246–47; 20 U.S.C. § 1401(26)(A).

The Third Circuit approach has been followed, to varying degrees, by the First, Second, Fourth, Sixth, Eighth, Ninth,[2] Eleventh, and D.C. Circuits.  *See*

_____

[2]Citing *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635, 643 (9th Cir. 1990), the District argues the Ninth Circuit rejects the severability approach of the other circuits.  In *Clovis,* the court stated that when determining whether a placement is reimbursable as a related service
(continued...)

*Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 298 n.8 (5th Cir. 2009) (collecting cases). The Seventh, and, more recently, the Fifth Circuits have taken a somewhat different approach. In *Dale M. ex rel. Alice M. v. Board of Education*, 237 F.3d 813, 817 (7th Cir. 2001), the Seventh Circuit held that when determining the scope of the "related services" which are reimbursable under the Act, "[t]he essential distinction is between services primarily oriented toward enabling a child to obtain an education and services oriented more toward enabling the child to engage in noneducational activities." Thus, the court concluded the placement of a child with serious behavioral problems at a private boarding school was not reimbursable because the principal service provided by the school to the child was confinement. *Id.* at 816–17. ("[T]he Elan School does

----

[2](...continued) under the Act the "analysis must focus on whether . . . [the] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Id.* (citing *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1990)). Although the court stated it was rejecting a version of the severability analysis used by a lower court, it expressly relied upon *Kruelle* in formulating its holding. *Id.* While we question the applicability of *Kruelle* to the Act's definition of "related services," *see infra* Part III.A.2., other cases in the Ninth Circuit subsequent to *Clovis* confirm that its interpretation of the Act is closer to the majority of circuits than to that of the Fifth or Seventh. *See, e.g., Seattle Sch. Dist. No. 1 v. B.S. ex rel. A.S.*, 82 F.3d 1493, 1502 (9th Cir. 1996) ("That A.S.'s disability, like most disabilities under the IDEA, stems from medical or psychiatric disorders, . . . and that Intermountain's program addresses these disorders in an attempt to ensure that A.S. is able to benefit from her education, does not render the program invalid or remove the District's financial responsibility.") In any event, our disposition of this appeal does not turn on the interpretation of Ninth Circuit case law.

not provide psychological services, at least to Dale. For him all it provides is confinement. . . . Elan is a jail substitute"). The court also purported to distinguish *Kruelle*, suggesting the placement at issue was a response to problems which were segregable from the learning process. *Id.* at 818.

The Fifth Circuit explicitly rejected the Third Circuit's approach, contending it "expands school district liability beyond that required by IDEA." *Michael Z.*, 580 F.3d at 299. Instead, the Fifth Circuit set forth the following test: "In order for a residential placement to be appropriate under IDEA, the placement must be 1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Id.* at 299. It clarified the first prong of its test to mean that "if a child is able to receive an educational benefit without the residential placement . . . the school is not required to pay for it under IDEA." *Id.* at 300. The second prong is "necessarily a fact-intensive inquiry," requiring the court to consider a variety of factors related to the placement including, but not limited to, the initial motivation for the placement and the manner in which progress at the facility is judged. *Id.* at 301. Under the Fifth Circuit's approach, after conducting an "analysis of the services as a whole," courts "must then examine each constituent part of the placement to weed out inappropriate treatments from the appropriate (and therefore reimbursable) ones." *Id.*

Here, the ALJ and district court concluded the placement at Innercept was reimbursable under the IDEA regardless of which approach was used to evaluate it. Under its application of the Third Circuit's framework, the court concluded Elizabeth's medical, social, and emotional problems were not segregable from the learning process. *See Kruelle*, 642 F.2d at 693. This conclusion rested on several pieces of evidence. First, Aspen's final report on Elizabeth indicated residential treatment was necessary for Elizabeth to receive necessary clinical and psychiatric care and "remain[] on a clear and successful academic path." In particular, the report indicated Elizabeth "is likely to show improvements in her school performance and behavior at a[] [residential treatment center] because of the clinical milieu that pervades the academic environment." Additionally, the court cited testimony before the IHO from Dr. Partha Gandhi, the director of psychology at Aspen; Dr. George Ullrich, the medical director and attending psychiatrist at Innercept; and David Miller, an assistant principal and counselor at Humanex, all indicating Elizabeth's mental health and emotional needs were intertwined with her academic success.

Under the Fifth and Seventh Circuit tests, the ALJ and district court also concluded the placement at Innercept was reimbursable. This conclusion, too, rested on several pieces of evidence: Innercept is a state-accredited educational institution in which Elizabeth worked toward her high school diploma. Elizabeth had stated to the principal and director of education at Innercept that graduation

was important to her; her schedule at Innercept included three hours of classroom time in the morning and one hour to ninety minutes of homework during the evening; and Innercept provided one-on-one instruction to Elizabeth for those times she was unable to participate in the classroom. The district court concluded these factors made the case distinguishable from those in which parents sought reimbursement for placement at psychiatric hospitals which merely happened to provide some educational services. *Cf. Butler v. Evans*, 225 F.3d 887, 893 (7th Cir. 2000) (denying reimbursement for placement at hospital where "[t]here is scant evidence that the hospital provided or was equipped to provide anything more than meager educational services.").

The parties and amici differ as to the framework this court should adopt for determining whether a residential placement is reimbursable under the Act. Parents, while maintaining the district court correctly concluded they were entitled to reimbursement under any test, urge the court to follow the Third Circuit approach. The District concedes it cannot prevail under the Third Circuit approach. It therefore argues this court should apply the "primarily oriented" test of the Seventh or Fifth Circuit and conclude the district court erred in determining Innercept was a reimbursable placement under the IDEA. In this case, however, it is unnecessary to endorse either approach because Elizabeth's placement at Innercept is reimbursable under a straightforward application of the statutory text.

-16-

20 U.S.C. § 1412(a)(10)(C)(ii) vests courts and hearing officers with the authority to order reimbursement to parents who unilaterally enroll their child in a "private . . . secondary school without the consent of or referral by the public agency . . . ." 20 U.S.C. § 1401(27) defines "secondary school" as "a nonprofit institutional day or residential school, including a public secondary charter school, that provides secondary education, *as determined under State law . . . .*" (emphasis added). Thus, one pre-requisite for the reimbursement of any private residential placement is that it be at an institution with educational accreditation under state law. Beyond that, there are two components of a FAPE under the IDEA: special education and related services. 20 U.S.C. § 1401(9). The Act defines "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(29)(A). The Act also provides a lengthy definition of the term "related services":

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, . . . social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services . . . and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education . . . .

20 U.S.C. § 1401(26)(A). The Act's definition of "related services" expressly contemplates that a child is receiving some type of special education. Therefore, a parental placement which does not provide the child with specially designed instruction is not reimbursable even if some services provided at the placement might otherwise be classifiable under the Act's definition of "related services."

If a child is receiving special education, however, Supreme Court precedent indicates the scope of the Act's definition of "related services" is relatively broad. In *Irving Independent School District. v. Tatro*, 468 U.S. 883, 891 (1984), the Court held that the administration of clean intermittent catheterization services to a public school student was a "related service" which the school was obliged to provide under the Act because, without such services, the child could not remain at school during the day. The Court also concluded such services did not fall within the Act's definition of "medical services," for which a school district is only obligated to provide for diagnostic and evaluation purposes. *Id.* at 891–92. The Court approved Department of Education regulations which limited excludable "medical services" to "services provided by a licensed physician." *Id.* at 892. The Court reinforced this holding in *Cedar Rapids Community School District v. Garret F. ex rel Charlene F.*, 526 U.S. 66, 73 (1999), concluding a school district was required to provide continuous one-on-one nursing services during the school day to a ventilator-dependant public school student. Further, the Court reaffirmed *Tatro*'s holding that the scope of the "medical services"

exception under the Act is limited to services which must be performed by a physician. *Id.* at 74, 76 ("Continuous services may be more costly and may require additional school personnel, but they are not thereby more 'medical.'").

The plain language of the Act thus supplies the appropriate framework through which to determine whether a unilateral private school placement without the consent of or referral by the school district is reimbursable. A court or hearing officer must:

(1) Determine whether the school district provided or made a FAPE available to the disabled child in a timely manner; if it did, the unilateral parental placement is not reimbursable. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); then

(2) Determine whether the private placement is a state-accredited elementary or secondary school; if not, the placement is not reimbursable. *Id.* §§ 1412(a)(10)(C)(ii), 1401(27); then

(3) Determine whether the private placement provides special education, *i.e.*, "specially designed instruction . . . to meet the unique

needs[3] of a child with a disability"; if the placement provides no such instruction, it is not reimbursable. *Id.* § 1401(29)(A).

(4) If the private placement provides additional services beyond specially designed instruction to meet the child's unique needs, determine whether such additional services can be characterized as "related services" under the Act, *i.e.*, "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education," excepting medical services which are not for diagnostic and evaluation purposes. *Id.* § 1401(26). If the additional services cannot be so characterized, they are not reimbursable.

Because this appeal can be resolved by a straightforward application of the statutory text, it is unnecessary to adopt either the so-called "inextricably intertwined"[4] approach of the Third Circuit or the "primarily oriented" standard of

---

[3]The concurrence suggests that the scope of the statutory term "special education" should be limited to specially designed instruction to meet the unique *educational* needs of a child with a disability. Concurring Op. at 3–4. This interpretation is plausible, although it leaves open the question of how broadly the term "educational needs" can be construed. *See, e.g., Kruelle*, 642 F.2d at 693 ("Where basic self-help and social skills . . . are lacking, formal education begins at that point."(quotation omitted)); *B.S.*, 82 F.3d at 1500 ("Everyone agrees that A.S. is exceptionally bright and thus was able to test appropriately on standardized tests. This is not the sine qua non of 'educational benefit,' however."); *see also* H.R. Rep. 98-140, 1983 U.S.C.C.A.N. 2088, 2106 (discussing possible amendment of Act's definition of "special education" to refer to "unique educational needs" of disabled child but also noting "[i]t is the intent of the committee that the term 'unique educational needs' be broadly construed to include the handicapped child's academic, social, health emotional, communicative, physical and vocational needs.")). It is unnecessary to determine the outer limits of this statutory term here, however, because the instruction at Innercept was designed to meet Elizabeth's educational needs. *See supra* Part III.A.3.

[4]The term "inextricably intertwined test" itself appears to have been coined not by any circuits which purportedly apply it, but rather by a circuit which

(continued...)

the Fifth and Seventh Circuits.[5] This permits us to avoid some of the interpretive difficulties presented by the approaches of the other circuits. To begin, the case law is frequently imprecise as to what portion of the Act is being interpreted when a determination is made that a residential placement is reimbursable. For example, the so-called "inextricably intertwined test" originally addressed only the scope of the term "special education" under the Act, and was silent as to the scope of the term "related services." *Kruelle*, 642 F.2d at 694 & n.23; *see also Mary T.*, 575 F.3d at 245–46 (applying *Kruelle* only to determine whether contested services constitute "special education" under the Act). Subsequent to *Kruelle*, however, both courts which purport to adopt and courts which purport to break from the Third Circuit approach frequently conflate the two statutory provisions. *See, e.g., Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643–44 (9th Cir. 1990); *Michael Z.*, 580 F.3d at 298; *Dale M.*, 237 F.3d at 817–18.

---

[4](...continued)
rejected it. *Compare Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 298 (5th Cir. 2009), *with Mary T. v. Sch. Dist.*, 575 F.3d 235, 243–44 (3d. Cir. 2009)*, and Kruelle*, 642 F.2d at 693.

[5]The concurrence opines that the court's opinion "venture[s] beyond . . . terra firma to offer a new (four step) test . . . for assessing private placements." Concurring Op. at 2. The court's opinion is not nearly so ambitious as to propose a new test. The claims presented on appeal have merely been resolved by applying the plain text of the statute.

Considering the two provisions of the Act separately and in sequence also highlights the fact-specific nature of most IDEA reimbursement claims. Thus, determining whether a child's needs are "segregable" (as the Third Circuit defines the term), while potentially helpful in some instances, is not central to a reviewing court's task in every case. Assuredly, there are some cases in which courts must decide just how broadly the Act's definition of "special education" extends in order to effectuate the Act's requirement that all children, no matter how disabled, receive some meaningful educational benefit. *See Kruelle*, 642 F.2d at 693; *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1149 (10th Cir. 2008); *see also supra* Part III.A.2 n.3. However, for others it may be clear or uncontested that a placement provides the type of "specially designed instruction" contemplated by the Act, and the dispute will instead center on whether additional supportive services provided at the placement are "required to assist" the child to obtain a meaningful educational benefit, *i.e.*, whether such services are "related services" under the Act.

A straightforward application of the Act's text also dispenses with the need to fully dissect the amorphous, judicially crafted "primarily oriented" standard of the Fifth and Seventh Circuits. Put simply, it is not at all clear that determining whether a placement is "primarily oriented toward enabling a child to obtain an education" sheds any light on the question of whether a placement provides specially designed instruction to meet a child's unique needs or whether

additional services provided by a placement are required to assist the child to benefit from such instruction. In particular, in the context of the statutory term "related services," the "primarily oriented" requirement is both over-inclusive and under-inclusive. It is not difficult to imagine a residential placement providing services that are required for a child to receive a meaningful education but are not themselves "primarily oriented" toward educational goals. Conversely, it is also possible to imagine services which can be construed as primarily oriented toward education but which are not required for a particular child to obtain an educational benefit.

Unquestionably, the genesis of the "primarily oriented" test is a concern with expanding school district liability beyond the requirements of the IDEA. *See Michael Z.*, 580 F.3d at 299. While a valid concern, the Act's reimbursement provisions already vest courts and hearing officers with the discretion to reduce or deny reimbursement at multiple stages. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) (describing circumstances in which a court or hearing officer "*may* require the agency to reimburse the parents for the cost" of private school enrollment (emphasis added)); *id.* § 1412(a)(10)(C)(iii) (describing circumstances in which reimbursement "*may* be reduced or denied" (emphasis added)). As both the Supreme Court and this court have made clear, the cost of the private placement and its impact on the school district's budget is always a relevant consideration

for a court or hearing officer when fashioning relief.  *Carter*, 510 U.S. at 15; *L.B.*, 379 F.3d at 979 n.18.

### 3.    Elizabeth's Placement at Innercept

Applying the above principles to the present case, this court concludes Elizabeth's placement at Innercept is reimbursable under the Act.  Because application of the plain text of the statute does not require any additional fact-finding and would not require the district court to address issues it has not already considered, remand is unnecessary.  Application of the first two steps is straightforward: the District did not provide a FAPE to Elizabeth and has not challenged that conclusion on appeal.  *Supra* Part III.A.1.  Further, the record indicates Innercept is an accredited educational facility in the state of Idaho staffed by state-accredited teachers.  It thus meets the Act's definition of a "secondary school" as determined under state law.  20 U.S.C. § 1401(27).

As to the third step, the unchallenged findings of the IHO, ALJ, and district court support the conclusion that Innercept provided specially designed instruction to meet Elizabeth's unique needs.  The IHO, ALJ, and district court each found Elizabeth's time at Innercept included several hours per day of traditional classroom instruction and one to one-and-a-half hours of directed homework.  Further, the district court found Innercept provides for one-on-one instruction outside the classroom for times when Elizabeth was unable to participate in the classroom.  Finally, although not noted by the district court, the

-24-

record before the IHO also indicates Elizabeth was enrolled in courses such as English, World History, Math Concepts, and Speech.

Having determined the placement at Innercept includes appropriate "special education," as defined in the Act, we proceed to determine whether the remainder of the services for which Parents sought reimbursement constitute "related services." Notably, the District has never challenged the reimbursability of any of the specific services provided at Innercept.[6] Instead, the District has argued that, according to the final report from Aspen, at least some of Elizabeth's educational needs could be addressed in a non-residential setting. This argument, however, ignores the report's conclusion that Elizabeth "is likely to show improvements in her school performance and behavior at a[] [residential treatment center] because of the clinical milieu that pervades the academic environment." It also ignores the testimony of Dr. Gandhi, Dr. Ullrich, and David Miller indicating that Elizabeth's educational needs could not be addressed without also addressing

---

[6]The closest the District ever came to developing such an argument was its assertion before the district court that $7,350.00 of Innercept's $9,800.00 per month cost was medical in nature. Parents argued in response that the only "medical" services provided at Innercept were those provided by a licensed physician, and that they amounted to four percent of Innercept's total monthly cost. The district court concluded there was insufficient information in the record for it to determine precisely how much reimbursement Parents were entitled to for "special education" and "related services" under the Act and how much of Innercept's cost was not reimbursable as a medical service. The court therefore directed Parents to obtain more detailed invoices from Innercept which distinguished between services provided by physicians and non-physicians, ordering reimbursement only for the latter.

her behavioral needs.  Finally, the District has argued Elizabeth's placement at Innercept is not reimbursable because Elizabeth would have required mental health services regardless of whether she was receiving educational services.  As set forth *supra* Part III.A.2, this argument relies on a reading of the Act at odds with its plain language.  Because the placement at Innercept provided both specially designed instruction to meet Elizabeth's unique needs and services required for her to benefit from that instruction, the district court properly concluded it was reimbursable.

B.    **Reduction or Denial of Reimbursement**

1.    **Statutory Framework and Standard of Review**

When a disabled child is enrolled in a private school by her parents, 20 U.S.C. § 1412(a)(10)(C)(iii) provides:

The cost of reimbursement . . . may be reduced or denied—

(I) if—

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice

to the public agency of the information described in item (aa);

(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

Thus, even if a private placement is otherwise reimbursable under the IDEA, in some circumstances the conduct of a child's parents in obtaining the placement may preclude or reduce reimbursement.

Here, the District argues, reimbursement should have been denied because Parents did not comply with the ten-day notice requirement of § 1412(a)(10)(C)(iii)(I)(bb) and because Parents did not make Elizabeth available for an evaluation per § 1412(a)(10)(C)(iii)(II). In briefing this issue, neither the District nor Parents address the standard of review. While, as a general matter, this court applies a "modified *de novo*" standard of review in IDEA cases, *see supra* Part III.A.1, because § 1412(a)(10)(C)(iii) describes circumstances in which a court *may* reduce or deny reimbursement, some courts have held a district court's judgment under this portion of the Act is reviewed only for abuse of discretion. *See Ashland Sch. Dist. v. E.H.*, 587 F.3d 1175, 1184 (9th Cir. 2009); *Michael Z.*, 580 F.3d at 301. Here, the district court concluded Parents neither

provided insufficient notice to the District nor failed to timely make Elizabeth available for evaluation and that even if presented with a closer question of sufficiency of notice or failure to make Elizabeth available for evaluation, it would not have reduced or denied reimbursement.  Nonetheless, the standard of review issue need not be resolved here because even under a modified *de novo* standard of review the district court properly refused to reduce or deny reimbursement under 20 U.S.C. § 1412(a)(10)(C)(iii).

### 2.    Ten-day Notice Requirement

To begin, Parents complied with the ten-day notice provision of § 1412(a)(10)(C)(iii)(I) by notifying the District via a letter dated November 10, 2008, of their intent to enroll Elizabeth at Innercept in ten business days.  The District, however, argues § 1412(a)(10)(C)(iii)(I)(bb) required Parents to provide ten days' notice of their intent to place Elizabeth at the Aspen Institute, and that their failure to do so constitutes grounds to reduce or deny reimbursement for Elizabeth's placement at Innercept.  As noted by the IHO, ALJ, and district court, the reference in § 1412(a)(10)(C)(iii)(I)(bb) to "the *removal* of the child from the public school" cannot be read to cover every instance in which a child is temporarily absent from school.  In context, the limitations on reimbursement in § 1412(a)(10)(C)(iii) affect § 1412(a)(10)(C)(ii), which addresses reimbursement for the cost of *enrollment* in private school.  Thus, the term "removal" in

§ 1412(a)(10)(C)(iii)(I)(bb) must refer to disenrollment from the public school system with the intent to place the child in a private school.

A close reading of the ten-day notice provision confirms this interpretation of the statute. Section 1412(a)(10)(C)(iii)(I)(bb) of the IDEA states reimbursement may be reduced or denied if "10 business days . . . prior to the removal of the child from the public school, the parents [fail to] give written notice to the public agency of the information described in item (aa)." The information described in item (aa) includes the parents' objection to the placement proposed by the school district and their intent to enroll their child in private school at public expense. Here, even by the time Elizabeth was placed for evaluation and treatment at Aspen, Parents were not rejecting any placement proposed by the District because the IEP for the coming school year had not yet been completed and the District had not yet proposed a placement for that year. Further, Parents could not have informed the District of their intent to enroll Elizabeth in private school at public expense ten days prior to her placement at Aspen because there is no evidence in the record indicating they had such intentions at that time.[7] Thus, the District's reading of the statute would put Parents in an impossible position, requiring them to come forward with non-

_____

[7] Parents have never sought reimbursement under the IDEA for Elizabeth's hospitalization at Aspen.

existent information simply to remain eligible for reimbursement under the Act in the event the District failed to provide a FAPE.

Finally, the District's reading of the statute is inconsistent with its purpose: affording school districts the opportunity to address parental objections to a proposed IEP prior to the removal of a disabled child from public school. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003). Here, the notice provided by Parents afforded the District with just such an opportunity. The District's refusal to take advantage of that opportunity stemmed from its erroneous position that it had no IDEA obligation to Elizabeth whatsoever because she was not physically present in Colorado. The ALJ and district court each concluded this position was legally untenable, and the District no longer advances it on appeal. *See Catlin v. Sobol*, 93 F.3d 1112, 1123 (2d Cir. 1996) (noting that under the IDEA a child's residence is the same as that of the child's parents). The district court therefore correctly refused to reduce or deny reimbursement based on the IDEA's ten-day notice provision.

### 3. Failure to Make Elizabeth Available for Evaluation

The District also argues reimbursement should have been reduced or denied under § 1412(a)(10)(C)(iii)(II) because Parents failed to make Elizabeth available for an IEP evaluation after receiving notice of the District's intent to conduct one. The District cites cases indicating parents who unilaterally remove a child from a public school system and place the child out of state before the public school is

able to conduct an evaluation may lose their eligibility for reimbursement under § 1412(a)(10)(C)(iii)(II). *See, e.g., Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 469 (7th Cir. 2000). Here, however, it was the District who unilaterally withdrew Elizabeth from Humanex upon learning of her hospitalization at Aspen. As of October 7, 2008, the District made clear its position it had no ongoing responsibility to Elizabeth under the IDEA. As late as December 2008, well after the ten-day notice period for Elizabeth's placement at Innercept had elapsed, Elizabeth's mother offered "to start anew and all work together to complete Elizabeth's IEP." The District declined, reiterating its position that, because Elizabeth was in Idaho, it did not "presently have an obligation to evaluate, convene IEP team meetings for, or otherwise serve Elizabeth under the IDEA." Based on these facts, the IHO, ALJ, and district court concluded the District extinguished any obligation Parents had to make Elizabeth available for evaluation under § 1412(a)(10)(C)(iii)(II).

Urging a contrary conclusion, the District identifies three communications in which it stated it stood "ready, willing, and able" to serve Elizabeth under the IDEA should she return to Colorado. These communications, however, do not satisfy the District's obligations under the statute. Section 1412(a)(10)(C)(iii)(II) requires that a public agency which gives notice of its intent to evaluate a child must do so "through the notice requirements described in [20 U.S.C.] §1415(b)(3)." Section 1415(b)(3) requires educational agencies to provide

"[w]ritten prior notice to the parents of the child . . . whenever the local educational agency . . . proposes to initiate or change; or . . . refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child."  Such "written prior notice" must be "in accordance with [20 U.S.C. § 1415(c)(1)]", *id.*, which provides:

> The notice required by subsection (b)(3) shall include —
>
> > (A) a description of the action proposed or refused by the agency;
> >
> > (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
> >
> > (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;
> >
> > (D) sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;
> >
> > (E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
> >
> > (F) a description of the factors that are relevant to the agency's proposal or refusal.

*See also* 34 C.F.R. § 300.503. None of the communications identified by the District meet these requirements, and the District makes no attempt to show that they do. Because the District did not properly "inform[] the parents . . . of its intent to evaluate the child," 20 U.S.C. § 1412(a)(10)(C)(iii)(II), the district court properly refused to reduce or deny reimbursement to Parents based on their alleged failure to make Elizabeth available for such an evaluation.[8]

## IV. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

---

[8]Aside from its failure to comply with the notice requirements of 20 U.S.C. § 1415(b)(3), the District's characterization of its statements that it stood "ready willing and able" to provide a FAPE to Elizabeth as a request to conduct an evaluation is dubious. Read in context with the District's repeated statements that it had no obligation to Elizabeth under the IDEA because she was not physically present in Colorado, at most the communications identified by the District could be read for the proposition that the District's offer to evaluate Elizabeth was conditioned on her *permanent* return to Colorado. The IDEA makes no allowance for such a condition.

11-1334, *Jefferson County School District R-1 v. Elizabeth E.*

**GORSUCH, J.**, Circuit Judge, concurring in the judgment.

The court's judgment is undoubtedly right and easily arrived at. To be sure, the Third, Fifth, and Seventh Circuits have adopted somewhat different (if also somewhat overlapping) tests for determining when public schools must pay private school tuition for disabled students. *See Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286 (5th Cir. 2009); *Dale M. ex rel. Alice M. v. Bd. of Educ.*, 237 F.3d 813 (7th Cir. 2001); *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687 (3d Cir. 1981). But as the district court rightly recognized, there's no need to invite ourselves into their dispute. No need because *all* of the available tests point to the same conclusion in this particular case: Elizabeth is entitled to a private placement.

As the district court explained, the defendant school district failed to provide Elizabeth with a free and appropriate public education, her private placement was essential to ensure she received a meaningful educational benefit, and the private placement was primarily oriented toward enabling her to obtain an education. All this, the district court concluded, made Elizabeth's private placement appropriate under *any* plausible test — even under the test favored by the school district and adopted by the Fifth Circuit. *See Richardson*, 580 F.3d at 299. Neither did the school district in this case present any serious challenge to the *specific amounts* Elizabeth incurred in connection with her private placement (for her education or related services); instead, as the district court observed, the

school district effectively chose to confine its attack to the propriety of her placement in the first place.

My colleagues and I agree with the district court's holdings on all these counts and no doubt this forms the narrowest and controlling ground for affirming the case before us. For their part, my colleagues venture beyond this terra firma to offer a new (four step) test of their own for assessing private placements — one that shares much in common with but also differs from the copious competing tests already circulating among circuit courts. I do not for a moment question the value of my colleagues' enterprise: stirring the pot may help courts find just the right recipe in the end. In particular, my colleagues do well to remind us that deciding whether a private school placement is appropriate (step 3) is an analytically separate and distinct task from the job of ascertaining whether each related service provided by that school (step 4) is subject to reimbursement by a public school district. Op. at 20-21. But it is equally clear that a new test isn't necessary to the disposition of this case: Elizabeth wins under any test. *See NLRB v. Int'l Bhd. of Elec. Workers*, 481 U.S. 573, 591 n.15 (1987) (statements "unnecessary to the disposition" are "dict[a]"); *United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1328 n.3 (10th Cir. 2009) (same).

Beyond that, I offer only this. In venturing their own test, my colleagues do not expressly condition private placement on a showing that it is essential to provide a meaningful educational benefit to the child. Instead, prong three of

their test says merely that private placement is appropriate if it provides

"specially designed instruction . . . to meet the [child's] unique needs."  Op. at

19.  Reading that passage in isolation, one might forgive future litigants if they

wonder whether my colleagues believe public school districts must pay for private

school placement even if the new school's "instruction" is limited to addressing

social or emotional problems or life challenges.

Such a reading, however, would be mistaken.  Under IDEA, public school

officials must evaluate the disabled students they serve and offer them

individualized plans "reasonably calculated to enable [them] to receive

*educational* benefits."  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 182, 207 (1982)

(emphasis added); *see also Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*,

540 F.3d 1143, 1148-50 (10th Cir. 2008).  If the public school fails to provide

some meaningful educational benefit to the child, it must finance a private

placement to get the job done.  20 U.S.C. § 1412(a)(10)(C)(ii); *see*

*also Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524,

526 (2007).  However else they may disagree, *all* of our sister circuits agree a

private placement under IDEA is permissible *only* if it is necessary to supply the

child with a meaningful *educational* benefit the public school has proven unable

or unwilling to supply — not to address purely social, emotional, or medical

needs.  *See, e.g.*, *Kruelle*, 642 F.2d at 693 (IDEA requires courts to ask whether

placement "may be considered necessary for educational purposes" rather than to

-3-

address "medical, social, or emotional" issues); *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 245-46 (3d Cir. 2009) (the required "link . . . between placement and the student's learning needs" was absent where the instructional program addressed "medical, rather than educational, conditions"); *Richardson*, 580 F.3d at 298-300 (first component of its test is whether private placement is "essential in order for the disabled child to receive a meaningful educational benefit" rather than to address "medical, social, or emotional problems"); *Dale M.*, 237 F.3d at 817 (same). This conclusion unsurprisingly aligns with Congress's stated purpose in enacting IDEA: its wish to ensure public schools address the "*educational* needs" of "children with disabilities," not to force public schools to displace all other social service agencies and become the providers of first resort of all medical, emotional, and social care and instruction. 20 U.S.C. § 1400(c)(2) (emphasis added).

Certainly I do not read my colleagues as disagreeing with this (rare, in this arena) point of agreement among our sister courts. There is nothing in my colleagues' opinion openly registering any disagreement; to the contrary, their opinion appears to sound regular notes of concurrence even if the terms of their proffered test aren't entirely clear. *See, e.g.*, Op. at 22 (noting that "related services" under their fourth test must "assist the child to obtain a meaningful *educational* benefit" (emphasis added) (internal quotation mark omitted)); *id.* at 25 (expert testimony that "Elizabeth's *educational* needs could not be addressed

-4-

without also addressing her behavioral needs" supports reimbursement (emphasis added)). Neither does their logic suggest that IDEA mandates reimbursement for services unnecessary to supply a meaningful educational benefit — services our existing circuit precedent places wholly outside the "free appropriate public education" the school district must supply. *See, e.g.*, *Thompson*, 540 F.3d at 1150.

With these observations, I am pleased to join the court's judgment.