FILED
United States Court of Appeals
Tenth Circuit

August 25, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENND CIRCUIT

<div style="border"></div>

ENDREW F., a minor, by and through
his parents and next friends, JOSEPH
F., and JENNIFER F.,

      Plaintiffs-Appellants,

v.

DOUGLAS COUNTY SCHOOL
DISTRICT RE-1,

      Defendant-Appellee.

No. 14-1417

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### (D.C. NO. 1:12-CV-02620-LTB)

Jack D. Robinson, Spies, Powers & Robinson, P.C., Denver, Colorado, for
Appellants.

Robert S. Ross, Jr., Douglas County School District Re-1, Castle Rock, Colorado,
for Appellee.

Before **HARTZ**, **TYMKOVICH**, and **PHILLIPS**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Federal law requires public schools to provide students with disabilities a

free and appropriate education. If a school cannot meet the educational needs of

a disabled student, the student's parents can place the child in private school and seek reimbursement of tuition and related expenses. In this case, the parents of an autistic child withdrew him from the Douglas County School District because they believed his educational progress was inadequate. They later sought reimbursement that the District challenged. The District's denial of reimbursement was upheld after a due process hearing in administrative court, and that determination was also upheld in federal district court.

We affirm. We find sufficient support in the record to affirm the findings of the administrative law judge that the child received some educational benefit while in the District's care and that is enough to satisfy the District's obligation to provide a free appropriate public education. Accordingly, under Tenth Circuit precedent, the District did not violate the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (IDEA), and is not required to reimburse the cost of the student's private-school education.

## I. Background

The IDEA makes federal education funding conditional on the states' provision of a "free appropriate public education" (FAPE) to all children with disabilities. *See* 20 U.S.C. § 1412(a)(1)(A). The central mechanism by which the Act ensures a FAPE for each child is the development and implementation of an individualized education program (IEP). *See id.* § 1401(9) (defining a FAPE as "special education and related services that . . . are provided in conformity with

-2-

the [IEP] required under section 1414(d)"); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368 (1985) ("The *modus operandi* of the Act is the . . . [IEP]." (internal quotation marks omitted)). An IEP is "a detailed written document which describes the student's educational goals for an academic year and establishes a plan to achieve those goals." *Jefferson Cty. Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B.*, 702 F.3d 1227, 1230 (10th Cir. 2012). The Act put in place detailed procedural requirements by which a child's IEP must be created and maintained. *See* 20 U.S.C. § 1414(d)(1)(A)(i). Beyond the procedure required, however, Congress "left the content of th[e] programs entirely to local educators and parents." *Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1151 (10th Cir. 2008). The Act does not prescribe the substantive level of achievement required for an appropriate education. Rather, the substantive adequacy of an IEP is determined by a standard articulated by the Supreme Court: the IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

The plaintiff-appellant, Endrew F. (Drew), was diagnosed with autism at the age of two and with attention deficit/hyperactivity disorder a year after that. Drew's autism affects his cognitive functioning, language and reading skills, and his social and adaptive abilities. Drew attended Douglas County schools from preschool through fourth grade. During that time, he received special-education services, including IEPs tailored to meet his unique needs.

At the conclusion of an especially rocky fourth-grade year, Drew's parents, Joseph and Jennifer F., decided Drew was not making any meaningful progress and rejected the IEP proposed by the District for fifth grade. As a result, they withdrew him from the District and instead enrolled him at Firefly Autism House, a private school that specializes in educating autistic children. The parents then turned to the District for reimbursement of Drew's private-school tuition and related expenses. *See* 20 U.S.C. § 1412(a)(10)(C)(ii). They contended the reimbursement was due because the District had failed to provide Drew with a FAPE.

After a three-day administrative due process hearing, *see id.* § 1415(f), an administrative law judge (ALJ) denied the request finding the District had provided Drew with a FAPE. The parents next filed suit in federal court for judicial review of the ALJ's decision. *See id.* § 1415(i)(2)(A). The district court affirmed.

## II. Discussion

Drew's parents contend they are entitled to tuition reimbursement under the IDEA and that the ALJ and the district court failed to recognize the District's procedural and substantive violations of the Act. After describing the tuition reimbursement provisions of the IDEA, we consider the District's denial of reimbursement and ask whether the procedural and substantive violations alleged by the parents resulted in the denial of a FAPE.

## A.  Tuition Reimbursement Under the IDEA

The IDEA allows parents who believe their children are not receiving a FAPE in state schools an option.  Those parents may pull their children from public school, enroll them in private school, and then request reimbursement from the school district.  *Id.* § 1412(a)(10)(C)(ii); *see also Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–13 (1993); *Burlington*, 471 U.S. at 370.[1]

Parents who take unilateral action, however, "'do so at their own financial risk.'"  *Jefferson Cty.*, 702 F.3d at 1232 (quoting *Florence Cty.*, 510 U.S. at 15).  If a school district denies the parents' request for reimbursement, a court may order reimbursement only if (1) "'the public placement violated IDEA'" and (2) "'the private school placement was proper under the Act.'"  *Id.* (quoting *Florence Cnty.*, 510 U.S. at 15).  There is no contention here that Drew's

---

[1]  Section 1412 provides:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(10)(C)(ii); *see also* 34 C.F.R. § 300.148(c).

placement at Firefly is not permissible under the Act.  The only issue is whether the District violated the IDEA by failing to provide Drew with a FAPE.[2]

In determining whether a school district provided a student with a FAPE, we follow a two-step analysis and ask (1) whether the district complied with the Act's procedural requirements, and (2) whether the IEP developed by those procedures is substantively adequate such that it is "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 207; *see also O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701 (10th Cir. 1998).  If a district has met both the procedural and substantive requirements, it "has complied with the obligations imposed by Congress and the courts can require no more."  *Rowley*, 458 U.S. at 207.

We review the district court's judgment de novo, applying the same standard of review as the district court.  *Jefferson Cty.*, 702 F.3d at 1232.  In reviewing an administrative decision in the IDEA context, we apply a modified de novo standard of review, meaning we give "'due weight'" to the administrative

---

[2]  A school district may also violate the Act by failing to provide a child with an education in the least restrictive environment.  *See Thompson*, 540 F.3d at 1148; *see also L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 975 n.13 (10th Cir. 2004) ("The IDEA requires *both* that the child be provided a FAPE *and* that such a FAPE be provided in an LRE [least restrictive environment] to the maximum extent appropriate.").  Drew and his parents do not raise this type of claim on appeal and we do not consider it.

proceedings and consider the ALJ's factual findings to be prima facie correct. *Id.* (quoting *Garcia v. Bd. of Educ.*, 520 F.3d 1116, 1125 (10th Cir. 2008)).

## B. Application

The parents raise both procedural and substantive challenges. They first allege two procedural deficiencies: (1) the District's failure to provide them with adequate reporting on Drew's progress during the school years, and (2) the District's failure to conduct a proper assessment of Drew's behavior and put in place an adequate plan to address his particular behavioral needs.

Their substantive challenge also proceeds in two parts. First, the parents argue the district court and the ALJ utilized the wrong legal standard in evaluating the substantive sufficiency of the rejected fifth-grade IEP. Second, they argue the ALJ and the district court erred in concluding the IEP was substantively adequate because (1) Drew made no measurable progress on the goals set in his past IEPs, and (2) there was no consideration of Drew's escalating behavioral problems.

We consider each in turn.

### 1. Procedural Challenges

The Supreme Court has emphasized the importance of the procedural safeguards contained in the Act, explaining that "[w]hen the elaborate and highly specific procedural safeguards embodied in [the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the

Act, . . . the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205. But merely identifying a procedural deficiency does not automatically entitle a family to relief. *See Systema ex rel. Systema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008); *O'Toole*, 144 F.3d at 701. A school district's procedural failure must have effectively denied the child a FAPE either because it (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or (3) "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E); *see also Garcia*, 520 F.3d at 1126 ("[O]ur precedent hold[s] that procedural failures under IDEA amount to substantive failures only where the procedural inadequacy results in an effective denial of a FAPE.").

Drew's parents contend they meet this standard because the District's alleged procedural violations impeded their ability to participate in informing Drew's education and denied Drew his right to adequate educational benefits.

### a. Progress Reporting

The first procedural deficiency alleged by the parents is the District's failure to adequately report Drew's progress toward the annual goals and objectives listed in his IEPs. They contend the lack of progress reporting deprived them of meaningful participation in Drew's education. We agree with

-8-

the District that, even assuming a procedural violation,[3] the District's progress reporting did not result in the denial of a FAPE.

As an initial matter, the District concedes that the progress reporting on Drew's IEPs could have been more robust. As the ALJ found, Drew's IEPs contain little or no progress reporting or measurement data and where progress was reported, it was "lacking in detail" or limited to "conclusory statements about whether [Drew] was on track to meet the expectations of the plan and whether the objective had been completed or would be continued." R., Vol. I at 9, 15. But the District contends what was reported was sufficient for the parents to assess Drew's progress and that whatever deficiencies existed, the parents' involvement in Drew's education did not suffer as a result.

Drew's parents were not absentee caretakers; they were just the opposite. The ALJ found that, in addition to the progress reporting that was included on Drew's IEPs, there was substantial evidence of the parents' awareness of Drew's progress and of their active participation in his education. For instance, the ALJ found the parents were "in constant communication" with Drew's special education teacher both through face-to-face meetings and a "back-and-forth

---

[3] The Act requires that the IEP include "a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided." 20 U.S.C. § 1414(d)(1)(A)(i)(III); *see also* 34 C.F.R. § 300.320(a)(3)(i). But neither the IDEA nor its implementing regulations actually prescribe the frequency or the content of progress reports.

notebook," which was used to inform the parents of what occurred at school and to inform Drew's teacher of what happened in the home. *Id.* at 16; *see also id.* at 96 (D. Ct. Op. at 23) (finding "significant informal communication with the parents as to [Drew's] progress"). Drew's teacher testified at the hearing that she sent home quarterly progress reports (concurrent with the timing of report cards). The parents also received Drew's draft IEPs in advance of each team meeting and were active in suggesting what goals and objectives should be modified, added, or dropped from Drew's IEPs. Accordingly, the ALJ did not err in concluding the gaps in the reporting on some of Drew's IEPs did not inhibit the parents from meaningful participation in Drew's education.

The parents point us to a case where a district court concluded that a school district's reporting deficiencies amounted to a substantive denial of a FAPE. *See Escambia Cty. Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248 (S.D. Ala. 2005). In that case, however, the student's IEPs not only lacked progress reporting, but also included annual goals and objectives that were alternatively described by the district court as "mushy, ambiguous, [and] unquantifiable" and "[v]ague and unmeasurable." *Id.* at 1274–75. The critical distinction between *Escambia* and Drew's case is that the hearing officer there "plainly found adverse impacts" caused by the procedural defects on the IEP team's ability to make necessary adjustments and interventions in the child's education. *Id.* at 1273–74. Here, by

contrast, the ALJ found the deficiencies in the District's reporting did not have an adverse impact on the IEP team's ability to craft and implement Drew's IEPs.

In reaching this conclusion, we do not downplay the importance of regular and diligent progress reporting on IEPs. In a system built on the continuous revision of individualized plans meant to address disabled students' unique needs, data on what is or is not working for a student is crucial. *See* Mitchell L. Yell et al., *Individualized Education Programs and Special Education Programming for Students with Disabilities in Urban Schools*, 41 Fordham Urb. L.J. 669, 709 (2013) ("Appropriate monitoring of a student's progress . . . is essential because without measuring a student's progress, it will be impossible to determine if the student's program is working."). Thus, while we do not endorse the District's reporting in this case, without evidence that there was an impact on Drew's education, we cannot say he was effectively denied a FAPE.

In short, the record supports the ALJ's conclusion the parents were aware of Drew's progress and fully participated in his education.

### b. *Behavioral Assessment*

The parents' second procedural argument is that the District's handling of Drew's behavioral needs amounted to a substantive denial of a FAPE. Specifically, they criticize (1) the District's failure to conduct a functional behavior assessment (FBA) before implementing a behavior plan for Drew, and (2) even absent the FBA, the District's failure to put in place an appropriate

behavioral intervention plan (BIP) to address Drew's increasing behavioral issues.[4]

Drew exhibited multiple behaviors that inhibited his ability to access learning in the classroom. In the past, he has climbed over furniture and other students, hit things, screamed, ran away from school, and twice removed his clothing and gone to the bathroom on the floor of the classroom. Drew's second and fourth grade IEPs contained behavior plans (although they are somewhat ambiguously marked "draft"). These plans identified some of Drew's problem behaviors and possible ways to manage and reduce those behaviors. The school was also in regular contact with the parents regarding Drew's behavior.

Despite the school's prior attempts to manage his behavior, during Drew's fourth-grade year his behaviors increased to such a degree that the school decided to go back to the drawing board and rework their approach. Drew's special education teacher kept notes on, and anecdotal data of, Drew's behavior in an effort to pinpoint Drew's triggers. The District also scheduled an autism specialist and a behavioral specialist to come in and meet with Drew's IEP team

---

[4] An FBA "identif[ies] the purpose—and more specifically the function—of problem behaviors by investigating the preexisting environmental factors that have served the purpose of these behaviors." Perry A. Zirkel, *Case Law for Functional Behavior Assessments and Behavior Intervention Plans: An Empirical Analysis*, 35 Seattle U. L. Rev. 175, 175 (2011). FBAs are often completed prior to and become the basis of a student's BIP, which is the "concrete plan of action for reducing problem behaviors." *Id.*

to put a new behavioral plan in place. The parents did not attend the meeting as they pulled Drew from the District before its scheduled date.

Drew's mother testified that the escalation of Drew's behavior left them with what they felt was one choice—to place Drew in a different learning environment. But as a matter of procedure, the District did not violate any provision of the IDEA or its implementing regulations. The Act provides that in developing and revising a student's IEP, the IEP team must, "in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); *see also* 34 C.F.R. § 300.324(a)(2)(i). The requirement is merely to "*consider* the use" of the listed behavioral interventions. *See* Perry A. Zirkel, *Case Law for Functional Behavior Assessments and Behavior Intervention Plans: An Empirical Analysis*, 35 Seattle L.R. 175, 186 (2011) (noting the operant verb is "to consider," and not "to develop or implement"). The statute only *requires* school districts (and even then, only "as appropriate") to conduct an FBA or to implement a behavioral plan if there is a disciplinary change in placement of the student.[5] *See* 20 U.S.C.

---

[5] State law often goes further than the IDEA with respect to when FBAs and BIPs are required. *See, e.g.*, *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 169 (2d Cir. 2014) ("New York state regulations go beyond this floor set by the IDEA; they require a school district to conduct a full FBA for a student who exhibits behavior that impedes learning, and to develop a BIP to address that behavior."). And school districts must comply with state educational

(continued...)

§ 1415(k)(1)(D)(ii) ("A child with a disability who is removed from the child's current placement . . . shall . . . receive, as appropriate, a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur."); *see also Park Hill Sch. Dist. v. Dass*, 655 F.3d 762, 766 (8th Cir. 2011) ("The IDEA only *requires* that an IEP include . . . a 'behavioral intervention plan' in limited circumstances not present in this case."); *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 25 (1st Cir. 2008) ("The IDEA only requires a behavioral plan when certain disciplinary actions are taken against a disabled child."); *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 614 (7th Cir. 2004); Susan C. Bon & Allan G. Osborne, Jr., *Does the Failure to Conduct an FBA or Develop a BIP Result in a Denial of a FAPE Under the IDEA?*, 307 Educ. L. Rep. 581, 581 (2014). And even where an FBA or BIP is required, the IDEA does not impose any substantive requirements as to what they must include. Bon & Osborne, *supra*, at 583.

Drew was never subject to a disciplinary change in placement. Thus, even though the record establishes that Drew is "a child whose behavior impedes the child's learning or that of others" all that was required by the Act was for the

---

[5](...continued)
standards that are not inconsistent with federal standards. *See O'Toole*, 144 F.3d at 698. Drew and his parents make no argument based on Colorado law and we do not consider it.

District to "consider" behavioral intervention. 20 U.S.C. § 1414(d)(3)(B)(i). The record is filled with examples of the District's consideration of Drew's behavioral issues. Thus, the District complied with federal law. *See R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813 (5th Cir. 2012) (finding the school district complied with federal law where the district considered behavioral interventions and the child had not been removed from her placement due to disciplinary infractions); *Lessard*, 518 F.3d at 26 (same).

In sum, we find no procedural defect that amounted to a denial of a FAPE.

### 2. Substantive Challenge

Because neither of the parents' procedural arguments establish a violation of the Act, we must resolve their argument that the District's proposed fifth-grade IEP was substantively inadequate. The parents submit it was not adequate for two reasons. First, because the fifth-grade IEP was similar in all material respects to Drew's past IEPs, they contend that Drew's lack of progress on the objectives listed in those IEPs is dispositive of whether the rejected IEP was reasonably calculated to provide Drew educational benefit. Second, the parents contend the ALJ failed to consider the impact of Drew's escalating behavioral problems in determining whether the IEP was reasonably calculated to provide Drew an educational benefit.

Before reaching these arguments, we must first address the parents' contention that our circuit recently shifted the standard with which we measure

-15-

the substantive adequacy of an IEP—that is, whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. Specifically, they argue our opinion in *Jefferson County School District v. Elizabeth E.*, 702 F.3d 1227 (10th Cir. 2012) abandoned the "some educational benefit" standard previously articulated in our cases (and applied by the ALJ and the district court) in favor of a heightened "meaningful educational benefit" standard.

A brief detour in the case law explains the argument and its resolution. In *Board of Education v. Rowley*, 458 U.S. 176 (1982), the Supreme Court, in considering the statutory precursor to the IDEA, the Education of the Handicapped Act (EHA), determined that Congress's aim had been to set a "basic floor of opportunity" for disabled children by "providing individualized services sufficient to provide every eligible child with '*some* educational benefit.'" *Thompson*, 540 F.3d 1143 at 1149 (quoting *Rowley*, 458 U.S. at 200). Congress did not "'guarantee educational services sufficient to maximize each child's potential.'" *Id.* (quoting *Rowley*, 458 U.S. at 198) (internal quotation marks omitted); *see also Rowley*, 458 U.S. at 192 (stating that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside"). This circuit has long subscribed to the *Rowley* Court's "some educational benefit" language in defining a FAPE, *see O'Toole*, 144 F.3d at 707–08, and interpreted it

-16-

to mean that "the educational benefit mandated by IDEA must merely be 'more than *de minimis*.'" *Thompson*, 540 F.3d at 1149 (quoting *Urban ex rel. Urban v. Jefferson Cty. Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996)).

Several circuits have adopted a higher standard—requiring a "meaningful educational benefit." *See, e.g.*, *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004); *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808–09 (5th Cir. 2003); *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182 (3d Cir. 1988). These courts have relied on other language in *Rowley*[6] as well as language in post-*Rowley* amendments to the IDEA, which some have interpreted as promising disabled children a higher measure of achievement.[7] This circuit, however, has continued to adhere to the *Rowley* Court's "some educational benefit" definition of a FAPE.[8] In *Thompson*, we

---

[6] The *Rowley* Court also said, "By passing the Act, Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access *meaningful*." 458 U.S. at 192 (emphasis added).

[7] In the wake of post-*Rowley* amendments to the IDEA in 1997 and 2004, many commentators argued for the adoption of a higher substantive standard. *See* Perry A. Zirkel, *Have the Amendments to the Individuals with Disabilities Education Act Razed* Rowley *and Raised the Substantive Standard for "Free Appropriate Public Education"?*, 28 J. Nat'l Ass'n Admin. L. Judiciary 396, 402–03 (2008); Perry A. Zirkel, *Is it Time for Elevating the Standard for FAPE Under IDEA?*, 79 Exceptional Child 497, 498–99 (2013).

[8] Although the "meaningful benefit" standard is purportedly higher than the "some benefit" standard, the difference between them—that is, how much

(continued...)

-17-

found it inconsequential that *Rowley* had analyzed the statutory precursor to the

IDEA because Congress has maintained the same statutory definition of a FAPE

from its initial inception in the EHA and in each subsequent amendment to the

Act.  *See* 540 F.3d at 1149 n.5.  We also noted that subsequent Supreme Court

decisions have cited *Rowley*'s definition of a FAPE approvingly.  *See id.* (citing

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525 (2007)); *see also* Ronald

D. Wenkart, *The* Rowley *Standard: A Circuit by Circuit Review of How* Rowley

_____

[8](...continued)
*more* benefit a student must receive for it to be meaningful—is not clear.
*Systema*, 538 F.3d at 1313 n.7 ("Admittedly, it is difficult to distinguish between
the requirements of the 'some benefit' and the 'meaningful benefit' standards.").
*Compare* Scott F. Johnson, Rowley *Forever More? A Call for Clarity and
Change*, 41 J.L. & Educ. 25, 27 (2012) (arguing that "[u]sing one standard or the
other can dramatically affect the outcome of a case and the services provided to a
student"), *with* Andrea Kayne Kaufman & Evan Blewett, *When Good Is No
Longer Good Enough: How the High Stakes Nature of the No Child Left Behind
Act Supplanted the* Rowley *Definition of a Free Appropriate Public Education*, 41
J.L. & Educ. 5, 20–21 (2012) (noting it is "unclear whether or not there is any
real difference . . . other than semantics"), *and* Ronald D. Wenkart, *The* Rowley
*Standard: A Circuit by Circuit Review of How* Rowley *Has Been Interpreted*, 247
Educ. L. Rep. 1, 4 (2009) (arguing that "the use of different terminology does not
appear to create different substantive standards or lead to different results").

Although commentators agree there is a circuit split on the applicable
standard, which circuit falls on which side varies depending on which
commentator you read.  *Compare* Kaufman & Blewett, *supra*, at 20 (stating that
the majority of the circuit courts adhere to the "some educational benefit"
standard), *and* Wenkart, *supra*, at 1 (same), *with* Scott Goldschmidt, *A New Idea
for Special-Education Law: Resolving the "Appropriate" Educational Benefit
Circuit Split and Ensuring a Meaningful Education for Students wtih Disabilities*,
60 Cath. U. L. Rev. 749, 751 (2011) (stating that "a slight majority" of circuits
"requir[e] a heightened-educational-benefit standard").

*Has Been Interpreted*, 247 Educ. L. Rep. 1, 5–6 (2009) (noting subsequent Supreme Court cases have not questioned or overruled the *Rowley* standard). And in *Systema ex rel. Systema v. Academy School District No. 20*, we explicitly rejected an argument that this court should follow the Third Circuit's heightened "meaningful benefit" standard because as we explained there, this circuit applies "the 'some benefit' standard the Supreme Court adopted in *Rowley*." 538 F.3d at 1313 & n.7 (citing *O'Toole*, 144 F.3d at 699).

The parents agree with us up to this point, but contend that our more recent opinion in *Jefferson County* marked a "fundamental shift" in circuit precedent and adopted the "meaningful educational benefit" standard. Aplt. Br. at 12. Relying on *Jefferson County*, they ask that we now expressly overturn *Thompson R2-J School District v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143—the case relied on by the ALJ and the district court for the "some educational benefit" standard. That we cannot do. We are bound by *Thompson* (and the cases preceding it) "absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000).

Nor do we see, in any event, evidence that the *Jefferson County* panel intended to abandon the "some educational benefit" standard. The issue in *Jefferson County* was not how much benefit to a child must be demonstrated to surpass the substantive threshold of a FAPE. In fact, the hearing officer in that case found the school district failed to provide the student with a FAPE and the

district did not appeal that finding before the ALJ, the district court, or on appeal to this court. Thus, we had no reason to discuss the proper standard to apply in making that determination.

The issue was how—absent a FAPE—to determine if a child's placement in a private, residential facility is proper under the Act and thus reimbursable. Much of the opinion was spent outlining the approaches from other circuits—as is relevant here, one from the Third Circuit and one from the Fifth. As referenced above, both the Third and the Fifth Circuits define a FAPE to require the conferral of a meaningful educational benefit. The three appearances of the phrase "meaningful educational benefit" in the majority opinion of *Jefferson County* is a reflection of the effort spent recounting the law of those circuits and not a discrete attempt to depart from this circuit's well-established definition of a FAPE. The first appearance of "meaningful educational benefit," for instance, appears within a quote from a Fifth Circuit opinion. 702 F.3d at 1234 (quoting *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 299 (5th Cir. 2009)). The second and third instances do recount that the IDEA requires "that all children, no matter how disabled, receive some meaningful educational benefit," *id.* at 1238, but that language is supported by both a cite to a Third Circuit opinion and a citation to *Thompson*. In our view, those citations—one to a circuit following a "meaningful educational benefit" standard and one following the "some educational benefit" standard—make it clear that the fleeting references to

-20-

"meaningful educational benefit" in *Jefferson County* is nothing more than that. Regardless, this panel, like the *Jefferson County* panel, has no authority to deviate from *Thompson*, or the cases preceding it,[9] that establish how much benefit must be shown to the child to find that a district provided a student with a FAPE in this circuit.

Thus, the ALJ and the district court applied the correct standard, and we too consider the parents' challenge to the sufficiency of the IEP under this circuit's "some educational benefit" standard. In applying this standard, the measure is whether the IEP is reasonably calculated to guarantee some educational benefit, not whether it *will* do so. Thus, "our precedent instructs that the measure and adequacy of an IEP can only be determined as of the time it is offered to the student. . . . Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Thompson*, 540 F.3d at 1149 (quoting *O'Toole*, 144 F.3d at 701–02) (internal quotation marks omitted).

The ALJ and the district court relied on evidence of Drew's progress on past IEPs as proof of the adequacy of the fifth-grade IEP. Although evidence of past progress is not "dispositive of the controlling question whether, going forward, the [latest] IEP was reasonably calculated to confer some educational

---

[9] *See, e.g.*, *Systema*, 538 F.3d at 1313 ("[W]e apply the 'some benefit' standard the Supreme Court adopted in *Rowley*."); *O'Toole*, 144 F.3d at 699.

-21-

benefit," we have said that past progress "strongly suggest[s]" the current IEP is "reasonably calculated to continue that trend." *Id.* at 1153.

In this case, the parents contend there is no trend of progress, both because the District failed to measure Drew's progress on his past IEPs and because any progress made was de minimis. The ALJ found that, despite the reporting deficiencies, it was evident that Drew made progress towards his academic and functional goals on his IEPs and that he received educational benefit during the time he was enrolled in the District.[10] The ALJ's finding of progress is a factual

---

[10] R., Vol. I at 8 ("Through first and second grade, [Drew] was progressing academically."); *id.* at 9 (finding Drew "was making progress towards some of [his] goals and objectives during . . . third grade"); *id.* (finding the objectives and criteria in Drew's 2008 IEP "were modified to account for [Drew's] progress toward those goals"); *id.* at 10 (finding that despite increased behavioral problems, "during the school year 2009 [Drew] was still making some progress towards [his] academic and functional goals"); *id.* at 12 (concluding that Drew "made progress" during his time in District schools).

The parents point to the district court's statement that the record "did not reveal immense educational growth," but was "sufficient to show a pattern of, at the least, minimal progress." *Id.* at 93. The parents say that statement proves that Drew's progress fell short of even the "some educational benefit" standard which requires *more* than de minimis progress. But the district court also stated that the "past IEPs reveal[] a pattern of *some progress* on his education and functional goals, and that the proposed IEP for the fifth grade continues that pattern." *Id.* at 94 (emphasis added); *see also id.* (stating Drew "made progress towards his academic and functional goals" and "received educational benefit while enrolled in the District"). Moreover, in reviewing the ALJ's decision, we apply the same standard as the district court, and as we conclude below, the ALJ's findings of progress are supported by the record and are sufficient to find Drew received some educational benefit.

-22-

finding that is owed a presumption of correctness under our modified de novo

standard of review. *See id.* at 1153 n.9.

And a review of the record reveals support for the ALJ's finding. Drew's

IEPs from second, third, and fourth grades[11] reveal that the objectives and

measuring criteria listed under the annual goals set for Drew by the IEP team

typically increased with difficulty from year to year. In the areas where Drew

was not ready to move ahead, the objective remained the same on the next year's

IEP. Drew's special education teacher testified at the hearing that the change in

objectives reflected the progress Drew was making. Drew's mother also testified

that despite her belief Drew was not reaching his potential, she did see some

academic progress in first, third, and fourth grades.

This is without question a close case, but we find there are sufficient

indications of Drew's past progress to find the IEP rejected by the parents

substantively adequate under our prevailing standard. It is clear from the

testimony at the due process hearing that Drew is thriving at Firefly. But it is not

the District's burden to pay for his placement there when Drew was making some

progress under its tutelage. That is all that is required. "The Act does not require

that States do whatever is necessary to ensure that all students achieve a

particular standardized level of ability and knowledge. Rather, it much more

modestly calls for the creation of individualized programs reasonably calculated

---

[11] Drew's IEPs from years prior to second grade are not in the record.

-23-

to enable the student to make *some* progress towards the goals within that program." *Thompson*, 540 F.3d at 1155 (emphasis added); *see also Rowley*, 458 U.S. at 197 n.21 (stating that the Act does not guarantee students "a potential-maximizing education").

The parents' final contention is that the District's handling of Drew's behavior is a relevant consideration in determining whether the IEP they rejected was substantively adequate. We find support for their contention in some of the case law, but disagree both that the ALJ ignored Drew's behavioral issues and that the District failed to address those issues. *See Alex R.*, 375 F.3d at 613 ("To meet the . . . substantive criterion of *Rowley*, an IEP must respond to all significant facets of the student's disability, both academic and behavioral."); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1029–30 (8th Cir. 2003) (holding the school district failed to provide an educational benefit by not addressing a student's behavioral issues). As recounted above, the District worked to address the behaviors that affected Drew's ability to learn in the classroom.[12] The ALJ found that "the District worked collaboratively with the parents and other service providers to address [Drew's] behaviors as they arose." R., Vol. I at 13. And when the District reached the conclusion that Drew's behavioral problems had

_____

[12] Although the parents take issue with the substance of the BIPs put in place by the District in prior years, neither the IDEA nor its implementing regulations prescribe substantive requirements for what should be included in BIPs. "[T]he District's behavioral intervention plan could not have fallen short of substantive criteria that do not exist . . . ." *Alex R.*, 375 F.3d at 615.

escalated to such a degree that they were creating a barrier to his academic progress during his fourth-grade year, they called in specialists to reassess and implement a new behavior plan. Drew never received the benefit of the District's efforts because his parents had already enrolled him in Firefly when the meeting was scheduled to take place.[13]

In sum, the record shows the District was actively working to address Drew's disability-related behaviors and that he made some academic progress despite his behavioral challenges. Accordingly, the parents have not met their burden of showing that the IEP they rejected was not reasonably calculated to enable Drew to receive educational benefits.

## III. Conclusion

For the foregoing reasons, we find the District provided Drew a free appropriate public education. Because the IDEA provides that reimbursement is due only where the school district has not made a FAPE available to the child, we

---

[13] The fifth-grade IEP rejected by the parents, dated April 14, 2010, did not yet include a new BIP because it was set to be drafted after the meeting with the behavioral specialists scheduled for May 10. The parents gave notice of their intent to withdraw Drew on May 1 and did not attend the May 10 meeting. District officials met without the parents in an effort to memorialize their findings on, and recommendations for, Drew's behavior. *See* R., Vol. I at 11 (finding by the ALJ that on May 10 "a draft BIP was prepared by the District"). The parents did meet with district officials the following November and were again presented with an IEP for Drew, which included the BIP drafted in May. That IEP was also rejected by the parents.

find the parents are not entitled to the compensation they seek.  Accordingly, we

AFFIRM the judgment of the district court.