**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2990
_____

S.C., Through His Parent Helen C.,
Appellant

v.

OXFORD AREA SCHOOL DISTRICT

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-16-cv-05286)
District Judge: Honorable Gene E.K. Pratter
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on July 9, 2018

Before: GREENAWAY, JR., RESTREPO, and BIBAS, *Circuit Judges*.

(Filed: November 2, 2018)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, does not constitute binding precedent.

BIBAS, *Circuit Judge*.

A school district must take steps that are reasonably calculated to enable a student to make appropriate academic progress in light his circumstances. As long as the district does so, it is not liable just because a student does not progress as quickly as his peers.

S.C., through his mother, claims that the Oxford Area School District denied him an appropriate education from ninth through eleventh grades because it did not address his anxiety and behavioral issues. But Oxford provided him with individualized educational programs from a young age. These programs helped him make academic progress and advance from grade to grade. They targeted his behavior and lack of focus, and they adjusted for his anxiety once that was known. Because these programs were reasonably calculated to enable S.C. to progress academically, we will affirm.

## I. BACKGROUND

### A. S.C.'s educational history

In 2006, when S.C. was about to start third grade in the Oxford Area School District, he was diagnosed with a reading and writing learning disability. A school psychologist noted that S.C. was "not showing major behavioral concerns at this time." App. 409. A reevaluation at the end of fifth grade found that he was making "acceptable progress" but still had the learning disability. App. 430.

At the end of eighth grade, S.C. was evaluated again. He had learning disabilities in reading comprehension, written language, and math problem-solving. S.C. was ordinarily

happy, social, and respectful at school. But his teachers also noted problems in the classroom: he was often tired, unfocused, inattentive, and easily distracted. S.C.'s mother agreed with the report; her concern was that he succeed in high school.

So Oxford, together with S.C.'s mother, crafted an individualized educational program with goals in reading comprehension, writing, math computation, and math application. To address S.C.'s lack of focus, his teachers would clarify and repeat directions, seat him near the front of classrooms, and prompt him orally to keep him focused. The program also gave S.C. up to twice the normal time limit to complete his tests, projects, and writing assignments.

In ninth grade, S.C. missed well over a hundred class periods. He missed one class twenty-four times and most other classes at least a dozen times. He struggled with algebra, so an Oxford special-education teacher worked with him one-on-one. Ultimately, S.C. failed not only algebra, but four other classes as well, so his GPA was 0.97. Yet he made progress toward his program goals and advanced to tenth grade by taking summer classes.

At the end of ninth grade, Oxford staff met with S.C.'s mother to develop a new program. S.C.'s mother was concerned about his reading and writing. So the program kept his goals for reading comprehension, written expression, and math. It also kept the oral prompts, preferential seating, and extra time for tests and assignments. And it provided for enrolling S.C. in a small academic-support class that graded students on behavior, organization, and completing assignments. S.C.'s mother again approved the program.

Tenth grade went better. S.C. continued making progress toward his program goals. His absences decreased and his grades increased. He failed no classes, and his GPA rose to 2.04.

After a meeting toward the end of that school year, S.C.'s program largely remained the same. It increased his goals for reading comprehension, written expression, and math. And it kept the oral directions, oral prompts, preferential seating, and extra time. S.C.'s mother again agreed, raising a concern only about S.C.'s handwriting.

Eleventh grade saw more progress, albeit uneven. S.C. kept racking up absences, including twenty-nine in his academic-support class. In December of that school year, S.C.'s mother brought the school a doctor's note saying that S.C. was anxious about his English class. So Oxford tried to set up another meeting with S.C.'s mother that January, but ran into a scheduling conflict. Meanwhile, Oxford proposed taking away S.C.'s electronics during class to minimize distractions, but his mother refused.

In March, everyone met to discuss the program. At his mother's request, Oxford planned to transition S.C. to a cyber school. In the meantime, Oxford gave S.C. access to an emotional support classroom "during times of extreme anxiety" and during his English class "at his discretion." App. 1337. And it amended the program to make sure S.C. would get "[p]ositive feedback when [S.C.] is on task and/or advocating for himself." App. 1356.

S.C. kept making progress on his program goals: He improved his non-fiction writing "a great deal," achieved some math goals, and had to pass only one more test to satisfy the reading goal. App. 1349-54. He made academic progress as well, passing all of his classes and raising his GPA to 2.19.

**B. This lawsuit**

S.C.'s mother filed an administrative complaint in December of S.C.'s twelfth-grade year. She claimed that the programs were inadequate and failed to ensure that S.C. received a free and appropriate public education. After a hearing, the hearing officer denied all relief. The District Court granted Oxford judgment on the administrative record. S.C.'s mother now appeals.

**C. Jurisdiction and standard of review**

The District Court had jurisdiction under 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. The District Court reviewed the hearing officer's decision using a "modified *de novo* standard," giving due weight to credibility determinations and accepting factual finding as prima facie correct. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). We review the District Court's factual findings for clear error and its legal conclusions de novo. *Id.*

## II. THE PROGRAMS WERE REASONABLY CALCULATED TO ENABLE S.C.'S PROGRESS

S.C. claims that Oxford denied him a free and appropriate public education because it ignored his anxiety, behavioral issues, and mental-health problems. *See* 20 U.S.C. § 1415(a). Under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1450, school districts must provide "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 1001 (2017).

But reasonable does not mean perfect. A program need not and cannot guarantee a student's academic progress. *Id.* at 999. So a student's "slow progress does not prove that [his

5

programs] were deficient." *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018).

Here, the hearing officer and the District Court both found the programs appropriate because they properly addressed S.C.'s behavior and enabled him to progress academically. There is no basis for disturbing those findings. S.C. kept pace with his grade level, went from failing several of his classes to passing all of them, and increased his GPA. And he achieved all that despite missing dozens if not hundreds of classes each year, including many of his academic-support classes.

The programs also addressed his behavioral issues. Teachers gave S.C. oral prompts, seating near the front of the classroom, extra time for his assignments, and the academic-support class to help him stay organized and focused. There was no reason to think that these measures were inadequate or that S.C.'s behavior signified anxiety. Although he now contends that his anxiety was evident, we cannot "rely on hindsight to second-guess an educational program that was reasonable at the time." *Id.* Once Oxford learned of his anxiety, it offered him an emotional-support classroom, let him skip the class that troubled him, and took other steps to help him. All of this was reasonable.

\* \* \* \* \*

Oxford provided programs that were tailored to S.C.'s needs and abilities and that were reasonably calculated to help him make academic progress. It is unfortunate that S.C. did not progress as far or as fast as his mother hoped he would. But Oxford met its legal obligation. We will affirm.

6